ROBERT KENT ANDREWS AND JONES ANDREWS, PLAINTIFFS v. ROBERT W. CRUMP, IN HIS INDIVIDUAL CAPACITY AS THE MANAGER OF THE CONTROLLED SUBSTANCE TAX SECTION OF THE NORTH CAROLINA DEPARTMENT OF REVENUE; R.A. HUGHES, IN HIS INDIVIDUAL CAPACITY AS THE DEPUTY SECRETARY, CONTROLLED SUBSTANCE TAX SECTION OF THE NORTH CAROLINA DEPARTMENT OF REVENUE, DEFENDANTS

No. COA00-140

(Filed 5 June 2001)

**1. Appeal and Error— appealability—denial of summary judgment—governmental immunity**

An order refusing to grant summary judgment or dismiss a case which declines to recognize a claim of governmental immunity affects a substantial right and is subject to immediate appeal.

**2. Immunity— governmental—prior federal action—issues of fact**

The trial court properly refused to dismiss or to grant summary judgment for defendants on plaintiffs' state law claims on the basis of issue preclusion and governmental immunity where defendants filed a controlled substance tax assessment against plaintiffs after marijuana was found on their property even though plaintiffs were not arrested; the certificates of tax liability

were eventually canceled; plaintiffs filed an action for a number of claims, including violation of 42 U.S.C. § 1983, malicious prosecution, and intentional infliction of emotional distress in state court; that action was removed to federal court; the federal magistrate determined that the § 1983 claim was barred by defendants' qualified immunity but declined to exercise jurisdiction over the state claims, dismissing them without prejudice; the action was re-opened in state court; and that court found that defendants were not shielded by qualified or sovereign immunity and that the state claims were not barred by res judicata. The issue of claim preclusion is not involved because the federal magistrate did not decide the state claims, and the determination that defendants had qualified immunity against the § 1983 claims does not mandate a finding that defendants have immunity to the state law claims because the § 1983 claim involved the objective reasonableness of the official's conduct based upon law clearly established at the time, while immunity to state claims involves a subjective determination of the state of mind of the governmental actor (corrupt or malicious conduct). Defendants have not answered plaintiffs' allegations of corrupt and malicious conduct and issues of fact remain as to whether defendants may be entitled to immunity.

Appeal by defendants from order entered 7 October 1999 by Judge L. Todd Burke in Alleghany County Superior Court. Heard in the Court of Appeals 20 February 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney General George W. Boylan, for defendant-appellants.*

*Law Office of Harold J. Bender, by R. Deke Falls, for plaintiff-appellees.*

HUDSON, Judge.

Defendants appeal an order of Judge L. Todd Burke declining to dismiss or to award summary judgment against plaintiffs' claims of malicious prosecution, intentional infliction of emotional distress, conspiracy to maliciously prosecute, and conspiracy to inflict emotional distress. Defendants argue plaintiffs' causes of action are barred by the doctrines of governmental immunity and claim preclusion. We affirm the trial court and remand for continuation of the proceedings below.

**ANDREWS v. CRUMP**

[144 N.C. App. 68 (2001)]

Facts pertinent to this case are as follows: on 14 July 1992, State Bureau of Investigation Special Agent Jeffrey Sellers was informed that a tractor trailer containing marijuana controlled by the Drug Enforcement Administration (DEA) was to be brought into western North Carolina by a group of undercover DEA agents and a cooperating informant. Law enforcement officers planned to arrest the individuals who had ordered the marijuana. On 16 July, the DEA agents and informant who were driving the truck met suspects John Anthony Norris, Donnie McLamb, and Steven Shew at a motel in Surry County. The three suspects then led the tractor trailer to a barn on a farm owned by Jones and Robert Andrews in Alleghany County, arriving around 9:15 p.m.

Sellers and approximately nineteen other federal, state, and county law enforcement officers set up surveillance of the barn at that time. At 10:41 p.m., the tractor trailer left the farm. Sometime thereafter, a 1986 Honda drove into the area where the officers were watching the barn and then drove away. The driver of the car was identified as a white male wearing glasses, and the car's tags indicated it was registered to Bonnie Andrews, known by local officers to be the recently separated wife of Robert Andrews.

Just after midnight, officers approached the barn. Steven Shew exited the barn and had a short conversation with the Alleghany County sheriff. Shew told the sheriff he was "just doing a little work" and that he had leased the barn from Robert Andrews. Inside the barn, officers found approximately 2,000 pounds of marijuana.

At approximately 1:28 a.m., officers went to the house of Jones Andrews. All the lights in the house were out, and it took him several minutes to get to the door. When Jones answered the door, it appeared he had just gotten out of bed. He told the officers he had not leased his barns to anyone and gave them permission to search his other barn. He thereafter accompanied the officers to the home of his son, Robert.

They approached Robert's house at around 2:00 a.m., and officers saw the 1986 Honda they had identified several hours earlier parked there. Robert came to the door quickly, fully dressed and wearing boots. The officers asked why he was fully dressed at that hour, and Robert told them he had fallen asleep on the couch. He said he had arrived at his residence at 5:00 p.m. the evening before and had not left since. When officers questioned him about seeing the Honda near the barn, Robert said his 15-year old son had been driving it earlier

that night. His son had told him he had seen some vehicles on the farm, but his son had assumed they were there for fox hunting. Officers did not question Robert's son.

Robert stated he had not leased the barn to anyone and did not know whose barrels of marijuana were in it. When informed that Steve Shew had been arrested in connection with the marijuana, Robert said he had heard rumors Shew was involved in drugs, but that he did not know him that well. Shew owed the Andrews money for some Christmas trees sold to him in the past, but Robert had never had any other dealings with him. Law enforcement officers did not believe they had probable cause to arrest Jones or Robert Andrews in connection with the marijuana, and no criminal charges were brought against them.

Hours after the marijuana was found, the Alleghany County sheriff contacted defendant R.A. Hughes, Deputy Secretary of the Controlled Substance Tax Section of the North Carolina Department of Revenue. Hughes immediately drove to Alleghany County to investigate the propriety of levying a controlled substance tax against those involved in the drug drop-off.

The controlled substance tax was enacted by the North Carolina General Assembly in 1989 and requires drug dealers to purchase stamps to affix to controlled substances in their possession. 1989 N.C. Sess. Laws ch. 772, § 1. The law imposes a tax against dealers who possess controlled substances without having purchased the proper stamps for them. The pertinent statute in effect during the events of the case *sub judice* stated:

> Notwithstanding any other provision of law, an assessment against a dealer who possesses a controlled substance to which a stamp has not been affixed as required by this Article shall be made as provided in this section. The Secretary [of Revenue] shall assess a tax, applicable penalties, and interest based on personal knowledge or information available to the Secretary.

N.C.G.S. § 105-113.111 (amended in 1997 to substitute "an unauthorized substance" for "a controlled substance" in first sentence).

Subsequent to his visit to Alleghany County, Hughes decided sufficient evidence existed to levy the controlled substance tax against Robert Andrews. He based his decision on the following information given to him by Special Agent Sellers and the Alleghany County sheriff: that Steve Shew had said he had rented the barn from Robert, that

the vehicle which had been driven in the area of the barn after the drop-off was registered to Robert's wife, and that when officers went to Robert's house to talk with him he was fully dressed and appeared "very nervous." Hughes conferred with his supervisor, defendant Robert Crump, and received Crump's approval to make a tax assessment based on the above information.

On 21 July 1992, Hughes issued a "Notice of Controlled Substance Tax Assessment" against Robert Andrews, pursuant to N.C. G.S. § 105-113.111. The assessment consisted of a $3,175,200.00 tax, a $3,175,200.00 penalty, and $21,273.84 in interest, for a total of $6,371,673.84, based upon the seizure of 2,000 pounds of marijuana from the Andrews' barn.

On 22 July 1992, Hughes filed a "Certificate of Tax Liability" with the Alleghany County Clerk of Superior Court, which constituted a lien on real property owned by Robert Jones from the date it was docketed, pursuant to N.C.G.S. § 105-242(c). Approximately two weeks later, Hughes filed another "Certificate of Tax Liability" with Surry County, as he had learned Robert owned land in Surry County as well. At the time he filed these certificates, Hughes knew Jones and Robert Andrews were in the Christmas tree business.

On or about 3 August 1992, Robert Andrews filed an objection to the assessment and a request for a hearing. On 11 September 1992, he and his attorney met with Crump for a pre-hearing conference and requested a statement of the evidence upon which the tax assessment and lien were based. Thereafter, Crump wrote to Special Agent Sellers requesting him to set forth the evidence against Robert. Sellers' supervisor, J.S. Momier, Jr., wrote back on 12 October 1992 detailing the events of 16 and 17 July 1992 and ending with the following conclusion:

Due to the facts that Shew had used the Andrews farm as a drop site for such a large amount of marijuana, that Andrews' vehicle was seen in the area around the barn by the surveillance teams while the marijuana was being worked in the barn, that at 2:00 a.m. in the morning when officers spoke with Andrews that he was fully dressed and appeared to be very nervous, and that by Steve Shew's statement that he leased the barn from Robert Andrews, it is believed that Robert Andrews was a silent partner for this shipment of marijuana and supplied the drop site for Shew.

ANDREWS v. CRUMP

[144 N.C. App. 68 (2001)]

Robert Andrews' attorney wrote Crump on 12 November 1992, urging him to make a prompt decision on the propriety of the assessment so that Robert "could sell his Christmas trees." He also wrote that "[a]s a direct result of the tax assessment still pending, my client has had to seek the protection of the Bankruptcy Court." Plaintiffs have alleged that the liens prohibited them from selling the Christmas trees on their property, and that without the income from the trees, they could not pay the mortgages on the property.

At some point in the fall of 1992, Hughes heard that Shew had recanted his statement that Robert Andrews had leased the barn to him. He also learned that it was Robert Andrews' son, not Robert himself, who had driven the Honda in the area of the barn on the night in question. Based on these facts, he came to the conclusion that the assessment should be lifted and shared this opinion with Crump. Crump then asked Hughes to find out if there was any other information tying Robert to the marijuana. Hughes reported back that he could not find any.

On 26 February 1993, United States Bankruptcy Judge Marvin R. Wooten entered an "Order Determining Tax Liability" on behalf of Robert Andrews, finding that "[t]he tax, penalty and interest assessed against the Debtor were assessed without good and valid basis in law or fact." Judge Wooten further found that the North Carolina Department of Revenue (DOR) had expressly consented to the tax cancellation sought by Robert Andrews. Judge Wooten ordered DOR to withdraw the tax assessment and release the liens filed in Alleghany and Surry counties within fifteen days. On approximately 21 March, Crump ordered Hughes to cancel the Certificates of Tax Liability. Hughes canceled the liens in Alleghany County on 23 March 1993 and in Surry County on 25 March 1993.

On 10 July 1995, Robert and Jones Andrews filed in Alleghany County Superior Court the suit which is the subject of this opinion. They alleged the defendants had seized their property in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983; maliciously prosecuted them in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983; maliciously prosecuted them in violation of state law; intentionally inflicted emotional distress upon them in violation of state law; and conspired together to commit all of the above violations. Jones Andrews was included as a plaintiff in that he co-owned property subject to the liens with his son. On 26 September 1995, defend-

ants responded with a motion to dismiss the plaintiffs' claims pursuant to N.C. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6).

On 6 September 1994, plaintiffs filed in the Western District of the United States District Court essentially the same complaint filed in Allegheny County Superior Court. Plaintiffs and defendants made a joint motion to remove the case from the Alleghany Superior Court trial docket pending resolution of the federal case, which motion was approved.

A Memorandum of Decision was filed 16 October 1996 by United States Magistrate Judge H. Brent McKnight in response to defendants' motion for summary judgment. He determined, in short, that plaintiffs' federal claims pursuant to 42 U.S.C. § 1983 (section 1983) were barred by the defendants' qualified immunity. He declined to exercise pendent jurisdiction over plaintiffs' state law claims and dismissed them without prejudice.

Plaintiffs thereafter moved the Alleghany County Superior Court to re-open the case, and defendants followed with a motion for summary judgment which incorporated their earlier motion to dismiss. Defendants' motion asserted that the doctrine of *res judicata* barred plaintiffs' state claims based on the federal court's finding that defendants had qualified immunity to plaintiffs' section 1983 claims.

The order of Judge L. Todd Burke was filed on 7 October 1999, denying defendants' motions to dismiss and for summary judgment. The trial court concluded it had jurisdiction over the parties and the subject matter, and that plaintiffs had adequately stated claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy to commit the preceding torts. It further found that defendants were not shielded as a matter of law under the doctrines of qualified or sovereign immunity, and that plaintiffs' state law claims were not barred by the doctrine of *res judicata*. Defendants filed notice of appeal to this Court on 4 November 1999.

[1] Normally, no appeal lies from an order refusing to dismiss a case or to grant summary judgment; however, when such an order declines to recognize a claim of governmental immunity on the part of defendants, it is subject to immediate appeal on that issue, as a substantial right is affected. *Denegar v. City of Charlotte*, 115 N.C. App. 166, 166-67, 443 S.E.2d 778, 779 (1994). We proceed therefore to address the immunity issues raised by defendants.

**[2]** The doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion), cited by defendants in their arguments for immunity, have been developed in order to protect parties from the burden of relitigating previously decided matters. *Bockweg v. Anderson*, 333 N.C. 486, 491, 428 S.E.2d 157, 161 (1993). Under claim preclusion, where a "second action between two parties is upon the same claim, the prior judgment serves as a bar to the relitigation of all matters that were or should have been adjudicated in the prior action." *Id.* at 492, 428 S.E.2d at 161. When a second action between the same parties involves different claims, however, the doctrine of issue preclusion bars retrial only of "issues actually litigated and determined in the original action." *Id.*

In the present case, the trial court allowed plaintiffs' state law claims of malicious prosecution, intentional infliction of emotional distress, and conspiracy to commit these torts to move forward. These claims were not decided by the federal court; rather, Magistrate Judge McKnight declined to decide plaintiffs' state law claims and dismissed them without prejudice. Therefore, the doctrine of claim preclusion is not involved here.

Defendants argue that the federal court's finding that defendants had "qualified immunity" to plaintiffs' section 1983 claims operates under the doctrine of issue preclusion to mandate a finding by the state court that defendants have governmental immunity to plaintiffs' state law claims. We must therefore determine what issues were actually decided by the federal court with regard to defendants' immunity. To do so, it is necessary to examine the concept of "qualified immunity" as it is set forth in the federal law of section 1983 claims.

Section 1983 is a vehicle by which private citizens can sue government officials acting under color of state law for violation of their constitutional rights. Governmental officials sued in their individual capacities, as were the defendants in this case, may be held liable for money damages under section 1983. *See Corum v. University of North Carolina*, 330 N.C. 761, 772, 413 S.E.2d 276, 283, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992). They may, however, raise the defense of qualified immunity to section 1983 claims. *Id.*

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L. Ed. 2d 396, 410 (1982).

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate the subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* at 818, 73 L. Ed. 2d at 410-11; *see* footnote 30 (explicitly applying the Court's decision to section 1983 claims).

North Carolina law regarding the immunity of government actors to suit under state law claims differs from the law of immunity in federal section 1983 actions. *See, e.g., Roberts v. Swain,* 126 N.C. App. 712, 487 S.E.2d 760, *cert. denied,* 347 N.C. 270, 493 S.E.2d 746 (1997) (analyzing immunity to state law claims and section 1983 claims under different standards). It may be summarized as follows:

> It is settled law in this jurisdiction that a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto. The rule in such cases is that an official may not be held liable unless it be alleged and proved that his act, or failure to act, was corrupt or malicious, or that he acted outside of and beyond the scope of his duties.

*Meyer v. Walls,* 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997) (quoting *Smith v. Hefner,* 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). Public employees, as opposed to public officials, do not enjoy the same protection, and may be held liable for mere negligence in the performance of their duties. *Id.*

Immunity of public officials to state law claims therefore involves a determination of the subjective state of mind of the governmental actor, *i.e.,* whether his actions were corrupt or malicious. By contrast, the U.S. Supreme Court stated in *Harlow v. Fitzgerald* that in determining qualified immunity to section 1983 cases, the trial court need not delve into the subjective motivation of the government actor. 457 U.S. at 815-18, 73 L. Ed. 2d at 409-10. Rather, the court

should examine the objective reasonableness of the official's conduct based upon law clearly established at the time. 457 U.S. at 818, 73 L. Ed. 2d at 410; *but cf. Corum,* 330 N.C. at 777, 413 S.E.2d at 286 (where the "clearly established law" contains a subjective element such as motive or intent, that element is properly a part of summary judgment analysis).

True to the dictate of *Harlow,* in the present case, Magistrate Judge McKnight did not consider the subjective intentions of the defendants in placing the tax liens on plaintiffs' property. Instead, he conducted a complex analysis of federal case law in effect at the time the liens were placed and determined, based on that case law, that although defendants did not have probable cause to believe Robert Andrews possessed marijuana, it was reasonable for the defendants to have been unaware that placing the liens constituted a seizure implicating the Fourth Amendment. *Andrews v. Crump,* 984 F. Supp. 393, 411-12 (W.D.N.C. 1996). He did not determine the defendants' actual knowledge or intentions regarding the violation of plaintiffs' rights. Thus, the federal judge's determination that defendants had qualified immunity against plaintiffs' section 1983 claims does not operate under the doctrine of issue preclusion to mandate a finding that defendants have immunity to plaintiffs' state law claims, which do involve issues of intent and state of mind.

Given that the federal court declined to rule on plaintiffs' state law claims and that defendants' qualified immunity to plaintiffs' section 1983 claims does not translate into governmental immunity to the state law claims, the trial court properly denied defendants' motion for summary judgment, which was based on the theories of issue and claim preclusion.

Assuming *arguendo* that defendants may be considered public officials as opposed to employees, their governmental immunity to the state law claims rests on whether their actions were "corrupt or malicious." Plaintiffs' complaint repeatedly alleges that the actions of defendants in placing the tax liens were corrupt and malicious. Plaintiffs allege, specifically, that defendants knew Robert Andrews had no involvement in criminal activity, yet proceeded to file the liens against him anyway.

Defendants have not filed an answer to plaintiffs' complaint, did not attach any evidence in contravention of plaintiffs' allegations to their motion for summary judgment, and did not make any arguments to the trial judge other than that the federal opinion pre-

cluded a finding of malice on the part of defendants. Although defendants did refer to certain depositions of law enforcement officers and Hughes at the hearing on the motion for summary judgment, the transcript of the hearing indicates they were not considered by the judge. *See* N.C. R. Civ. P. 56(c) (motion for summary judgment shall be served at least 10 days before the hearing). As defendants have not countered plaintiffs' allegations of corrupt and malicious conduct, issues of fact remain as to whether defendants may be entitled to governmental immunity.

Defendants additionally contend that plaintiffs' complaint cannot state a claim against them in their individual capacities because plaintiffs allege defendants were at all pertinent times acting within the scope of their employment. This assertion is without merit. Whether a plaintiff's allegations relate to actions outside the scope of a defendant's official duties is relevant in determining if the defendant is entitled to immunity, but it is "not relevant in determining whether the defendant is being sued in his or her official or individual capacity." *Meyer*, 347 N.C. at 111, 489 S.E.2d at 888.

Defendants' remaining arguments were not assigned as error, and do not involve issues of immunity, and thus we do not address them. *See* N.C. R. App. P. 10(a) (Court's review limited to consideration of assignments of error set out in the record on appeal).

In conclusion, the trial court's refusal to dismiss or to grant summary judgment against plaintiffs' state law claims on the basis of issue preclusion and governmental immunity was proper.

Affirmed.

Judges GREENE and McCULLOUGH concur.